The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having a manner of form of business before the Honorable United States Court of Appeals for the Fourth Circuit, I must withdraw now and give their attention, for the Court is now sitting. Godspeed to the United States and its Honorable Court. Be seated. We're pleased to have all of you all here this morning, and we look forward to these four interesting cases. The first one is Valentine v. Sugar Rock, Inc., Mr. Huggins. Pleased to hear from you, sir. May it please the Court, my name is Jim Huggins, and I represent Clifton Valentine, the plaintiff and the appellant in this case, and let me first of all note that it is an honor and privilege to argue today before the First Circuit Court of Appeals. I will start by saying that Mr. Valentine is approximately 83 years old, and he made some investments in six wells and four partnerships in the late 50s, 58, 59, 60, with a gentleman named Frank Deem, F.A. Deem. They drilled the six wells, the six wells produced. Frank Deem, I think, died in the 70s. His son, William Deem, got the interest, or some of the interest of the father. He carried on as operator from, I think, the mid-70s until April of 1999, whereupon Mr. William Deem sold his interest to Sugar Rock, Incorporated. For that period, from 1958 through 1999, which is about 40 years, Mr. Valentine received accountings, received distributions, net of expenses, and received ancillary information. He received that after Frank Deem died, when William Deem took over, and he received that up until April of 1999. When Sugar Rock came in, he received nothing. He didn't receive accountings. He did receive some letters informing him of the transfer, but he didn't receive any accountings, and he didn't receive any distributions. Mr. Valentine testified that he probably received about $100,000 from his investment during that 40-year period. He has received— How much did he invest beginning with? Pardon? How much did he put into it at the beginning? Again, based on Mr. Valentine's testimony, I think he testified about $350 per 32nd. So it varied. Some wells, he had a 532nd interest. Some wells, he had a 132nd interest. Some wells, he had a 232nd interest. It varied with the well. So his investment was not uniform across all the wells and all the partnerships. But you say that you got $100,000 out of it. I thought maybe you'd give us a number of how much you put in it. You can't do that. Well, I mean, I can probably do the math. Not that it makes any difference. You go ahead. $350 times however many 32nds he had. Would you agree that, insofar as this case is concerned, that standard partnership law is different from mining partnership law in the eyes of the law? In some respects. And so all that stuff about the K1s and the various things he got, that just goes to intent about a partnership. It doesn't convert it into a mining partnership, does it? I would go through the analysis a little bit differently. I would say that, under the Lance v. Tumlin case, which we have cited and relied on extensively, the West Virginia Supreme Court of Appeals says you have to determine whether there's a partnership. The fact that it's a mining partnership just means, in my opinion, that the investment is in an oil and gas venture or a coal mine or whatever. Doesn't it go further than that? Isn't that a co-tenancy issue? You're, in fact, co-tenants undertaking to operate the lease of a property? Isn't that the distinction between the partnership, general partnership and a mining partnership? I think the distinction is, if you're a tenant in common, there's a different protocol of rules than if you're a mining partnership than if you're a net profits interest. So I would say, can you have a mining partnership without having a piece of paper assigning you an interest in the well? And my answer is yes, because the definition of a partnership, more than anything else, is two or more people who are in co-ownership in business to make a profit. And I think, Your Honor, when we talk about the distinction between an ordinary partnership and a mining partnership, the principle, and I'm not real good on my Latin here, but the principle was delectus persononum, or personarum, and that is, if a partner died under the old common law, it dissolved the partnership, and in a mining partnership, if the partner dies, it doesn't dissolve the mining partnership. It continues. A partner in a mining partnership can transfer his interest, and it will have no effect on the mining partnership. So I think that's the primary focus in the difference between an ordinary partnership and a mining partnership. So- What did your man have here? What's that? What did your man have, Mr. Valentine? He does not have in his possession a written document which assigned a working interest in the well. And I want to get back to Judge Floyd's one more comment. The reason that we get into the mining partnership issue, I think, is most of these cases involve we have, are we a tenancy in common, or are we a mining partnership? And the two cases that we cited, Lance v. Tomlin, involved a partner who had no piece of paper, and he was sued by the other partner for contribution in the winding up of the mining partnership. And so the argument was made there, well, you don't, I don't have a statute of frauds. You cannot sue me, even though I have no, because I have no interest in the well. I have no assignment of the lease. The lease is in Lance's name. The plaintiff, you have no claim against me, and the West Virginia Supreme Court of Appeals rejected that. And they said, you are a partner. The other case is that manufacturer's case that we cited, the manufacturer's heating and light case, in which we had, again, a little bit different fact pattern. We had 18 different working interest owners and an operator, and the third party vendor is suing to recover on the account against the mining partnership and the other 18 or 19 mining partners. The mining partners said, oh, we're tenants in common. We're not a mining partnership. That doesn't, that doesn't cut mustard here. And the, again, the Supreme Court of Appeals of West Virginia rejected that argument and said you are a mining partner, and you are liable, reversed and remanded, I think, you are liable for your proportionate share of that debt to the vendor. So I would challenge the court to think of it in these terms, and I think that the trial court really got lost in the titling issues. The first order of business in establishing whether you have a partnership is do we have two or more people who co-own property to make a profit, and I think we meet that definition with these facts. Do I have an assignment? I do not have an assignment. I probably did have an assignment. I'm speculating. You don't have anything in writing. I don't have anything in writing from Mr. Dean except his son sent a stockholders list, that's what they called it, in 1986. He also has been the beneficiary of the K-1s. He's on the stockholders list. Yes. Your man's on the stockholders list. Yes, he was, and that's in the record. So we do have that. We also have the course of conduct of the parties. We also have the 2001 lawsuit. In which... Your man? Yes. And they claimed he was an owner? Yes. Then they dismissed it? Well I think it was dismissed for want of prosecution. I wasn't involved. Court dismissed it then? Yes. Yes. So what I was going to... What did you say? That's judicial estoppel or something? Yes. They alleged it? Yes. Yes. The allegations that were made... You have to be to win. What kind of an owner have you got to be to win? Well... Between you and the other side on that? It matters to us how it's classified, Your Honor. Pardon? It matters to us how the interest is classified. Okay. You know, am I a tenant in common? I don't think I am a tenant in common, because if I'm a tenant in common, I can partition it and get on with it. I've got something more than a net profit's interest. A net profit's interest does not involve an ownership interest at all. I think I do. I bought something. My client bought something in 1958 and 59. He bought something. He bought an interest in a well. He's testified he bought an interest in the lease. So that leaves me with the partnership. The operator, Sugar Rock, William Deem, Frank Deem, had some operational rights. In the state court action, we are taking the position and have taken the position to be consistent here that Mr. or that Mr. Allen is not involved in that, that we need... We have partnerships. We have mining partnerships. We have mining partners. And by the way, we've gotten that before the court. The circuit court has ruled that these other people are mining partners and these are mining partnerships. And now we're in the... and we have just recently adjusted so that we have all the parties who are minority partners as plaintiffs, every one of them, except Mr. Valentine, who originally was a party. And so what we're left with is a... The case is now turned into exactly what we told Judge Keeley would happen. We are now seeking the plenary relief of dissolution of the mining partnerships, winding up of the mining partnerships. Why? Because we have not received any profit or any distribution since 1999. The appointment of a receiver and a declaration of exactly what the partnership property entails. So that's ongoing. Hope I answered your question, Judge Floyd. I don't know if I did. Well, you know, now I'm assuming you think Judge Keeley was wrong when she wrote that... She agrees with you that you don't have to have a partnership agreement in writing. But what is... She goes on to say what is required is that you have an interest in the property, which you indicate you don't have. We have an interest in the property as any other partner does. We have the same interest as any other... We have the same interest as Sugar Rock has. The titling issue is not dispositive of the issue of the mining partnership. And I'll explain that maybe in my rebuttal. Thank you, Your Honors. Thank you, Mr. Huggins. Mr. Lawrence. Good morning. May it please the Court, I'm Henry Lawrence. I represent the defendants in this matter, Sugar Rock Inc., Gerald Hall, and his wife, Teresa Hall. We come before the Court today asking that the Court affirm the lower court's ruling both as to summary judgment, where Judge Keeley ruled that under West Virginia law, absent an ownership in the property, one may not be a mining partner. We also ask the Court to affirm her ruling where she denied the motion to dismiss filed by Mr. Valentine on the eve of dispositive motion filing. Two issues before the Court. First is, did the trial court properly grant summary judgment where Mr. Valentine admitted that he had no ownership interest in the property, that being the leases and the wells? The second issue that's before the Court deals with the motion to dismiss. Judge Keeley determined that it would be unfairly prejudicial to the defendants for the case to be dismissed after pending for one year and full development, close of discovery, and the briefing. Factually, the development of this is significant from the standpoint of how old these wells are and exactly how Mr. Deem, Mr. F.A. Deem, entered into these transactions. Mr. F.A. Deem went out and obtained a number of leases for oil and gas rights in Ritchie County back in the 1950s. He then went out to raise money for drilling those wells, and the cost of the wells at that time, 32nd interest, between $300 and $350, $10,000 a well. Mr. Valentine had various interests in the wells. He testified that his father actually had been the source of the money and the funding for the wells, that he received those. He testified that he received a $100,000 return was his estimate, quite a significant return. However, following the death of F.A. Deem, his son, Bill Deem, W.A. Deem, took over operations. That was approximately 1974. In 1986, he sent out a letter, his accountant sent out a letter saying, this is what my father's records show. Please confirm that you are a shareholder and these are the amounts that you own. Mr. W.A. Deem, Mr. Bill Deem, did very little work on the wells. In 1999, Mr. Hall, who was native to that area, approached Mr. W.A. Deem about buying the wells. He bought the wells, bought the leases, bought all of the interest that W.A. Deem had. The wells were 40 years old by that time. They were not in very good operating shape. Mr. W.A. Deem had not spent much money in maintaining the pipeline. What year was that? That was 1999, your honor. 1999. That's when Sugar Rock got into it. That's correct. And... And up until then, Ballantyne had gotten money, gotten distribution or whatever they're called. Pardon? He testified to that. He produced no records to substantiate that. Mr. W.A. Deem did not transfer records to... He indicated that his records had been destroyed. He did not transfer records to Sugar Rock. But Mr. Ballantyne testified that he had received money through 1999. When Mr. Hall took over operations, both he asked Mr. Deem to send out a letter advising those shareholders that operations were being changed. When Mr. Hall came in, he sent out letters in 1999 and in 2000 advising the shareholders that there would be significant work needed on the wells. He said that he outlined the expenses that he would incur in operating, outlined the work that would be needed both on the pipelines, the gathering lines, on the wells themselves, and entered into new gas purchase contracts to obtain a better price for the gas. What, if any, effect would that after Sugar Rock took over, you were operating at a net loss, and Mr. Ballantyne was asked to pay some of these losses, and he didn't. I guess to follow up on Judge King's question about judicial estoppel, was that raised below? And if not, how does that failure to pay the expenses affect this case? Your Honor, the judicial estoppel argument was not raised below. With respect to the lawsuit that was filed in 2001 by Sugar Rock to recover on unpaid expenses, Mr. Ballantyne defended that case and said, at that point he said, I am a shareholder in the wells. I'm entitled to profits from the wells, but I'm not obligated to pay any of the expenses in the well. We submit that argument is directly contrary to his argument as a partner in a mining partnership. The case law that was developed in West Virginia— He's judicially estoppel. Well, neither side argued that. The case was— Well, I know, but whether he argued it or not, I don't think the differences are enough. It's a legal theory or something here. Correct. Sugar Rock— Well, both of you got something to stand on. He put in money in 1958 and 59. If that's believed, under your position, he didn't get anything for it. He received— Nothing. He received payments for 40 years from the wells. And in your theory, his interest dissipated in 1999 when you bought it. If any interest existed at all— Well, he had to have— If he put money in, unless we ripped him off, he must have—he got something for it. We contend that— He says he bought the number of 30 seconds in these six wells, or whatever they were, $350 apiece. He put up money and got some interest in these wells. And your position is he didn't get anything, I guess. Your Honor, he's a shareholder, working interest owner, in the wells. He continued to receive the K-1s for the years— So you're saying, when you bought it from Demat, that was the end of his interest? By not contributing, in 2000, 2001, when there was assessment for work done on the wells— And he withdrew. Is that what it was? His failure to contribute resulted in the forfeiture of his interest. All right. He failed to contribute in 2000 and 2001 and forfeited his interest. That's correct. So you don't claim he didn't ever have an interest. You say he had one and forfeited it. That's partially correct, Your Honor. We submit that he is not a mining partner. And the significance of that, what this whole case turns on—it's not been raised, at least in argument yet—what this case turns on is not so much the ownership interest in the wells. The case turns on the ownership interest in the leases. The significance of the leases is because back in the late 2000 period—2009, 2010, 2011—when this lawsuit was filed, horizontal drilling began in the Marcellus and Utica shales. And the practice, the value of leases that were held by production, such as this lease, increased dramatically. There were signing bonuses, $5,000 an acre, where there previously were no signing bonuses being given for assignments of the deep rights. And that's the reason—we submit that's the reason for the litigation. There is an argument of an ownership interest in a well, but the significance of this litigation relates to the ownership interest in a lease. As Judge Keeley correctly noted, one of the significant features, if not the main feature of a mining partnership, is co-tenancy. All of the mining partners have to own an underlying interest in the lease and in the wells. Mr. Valentine recognizes that he does not, but he argues that should not make any difference. What does he own? Going back to Judge King's question, which, in my mind, you never answered, what did he—what was divided into 32 parts that he purchased? What was divided into 32 parts that he purchased? He was a shareholder in the well. No, I didn't ask you that. I'm asking you, what was divided? What was the thing that was divided into 32 parts that he purchased those parts in? The right to participate in the investment in the well, to share in the proceeds, and to— From the lease, right? Production of the leases? No, Your Honor. Not from the lease, from the well. And what you have, subsequent to Mr. W. Adim taking over for his father, he farmed out locations on those leases. So he purchased property? I mean, profit, a share of profit that didn't exist at that time? That's correct, Your Honor. He purchased a share in a well. That was in the 1950s. That was— That's different now. Now, you're switching now. You're switching it. You said he only purchased a right to have 32 parts of profits from the well, or did he purchase something that was more tangible? No, Your Honor. It was a right to share in the profits of the well. So if there are no profits, he purchased nothing? That's correct. If it's a dry hole— At the time of the purchase, there was nothing? If it had been a dry hole, then that's part of the risk. Of course, there were tax advantages, tax incentives that protected— He'd have gotten some write-offs or something, wouldn't he? That's correct, Your Honor. And as he received yearly losses— So he did buy something, because if you don't get any profits, you get a write-off on your taxes or something. He was a shareholder— It's something of value. He was a shareholder in a well. And Judge Keeley raised that question during— And there's no records in the clerk's office up there in Richey County of any of this stuff? No, Your Honor. Both sides looked. Both sides agreed that there's no assignment to Clifton Valentine. But the leases were never filed of record? The leases were filed. Those leases were obtained by Mr. F.A. Deem. Those leases are in his name. The Deem leases were there, but Deem then sold interests off to these people. There's nothing that shows that except this 1986 thing? That's correct, Your Honor. That was not recorded. That was simply a letter saying— That's the letter. But that exists. Clearly, it does. Both sides agreed that that 1986 thing exists, and that he received monies for 41 years. That's correct. And Mr. Hall has continued to send— I mean, for summary judgment, we've got to give him the fact, right? That's correct. That he gets the benefit of the fact in his favor. That's correct, Your Honor. For you to prevail. Yeah. And Judge Keeley invited—we started the pretrial conference on a Friday. We adjourned, came back on a Monday morning for part two of the pretrial conference. She invited the plaintiff to come back, and she said, you may own something, but you are not a mining partner. You do not have an ownership interest in the leases. You've received K-1s, you've received distributions for these six months. And the question is whether that's a factual question that a jury has to decide rather than Judge Keeley. Is that right? We submit it as not, Your Honor. It's a matter of— No, I know you do. I know you submit it's not, and he submits that it is, but that's the question we have is whether that was a factual question that a jury needed to decide or whether that was a legal question that Judge Keeley was entitled to decide. That's correct, Your Honor. Okay. We submit it is a—was a legal question. Right. And you say it's a legal question. He says it's a factual question. That's what this thing kind of boils down to, on whether there's a factual question that precludes an award of summary judgment. Is that right or wrong? We submit that the facts as presented— Well, you submit there are no factual questions. That's correct. It's a matter of law. And giving him the facts in the light most favorable to Mr. Valentine, he loses. And he admits that he had no ownership interest. He has no document establishing an ownership— He had no documents, but I thought that Judge Keeley said that you could prove it even without the documents. But what he argued was that because he was a partner in a partnership, those assets were in the partnership, and he had title through the partnership assets. And the law does not support that argument. The mining partnership law was first developed out in the Southwest in the coal mining in the late 1800s. There are several U.S. Supreme Court cases that recognize that a mining partnership can exist where co-tenants—that's co-owners of leases or properties—mine the property together. When that—the first West Virginia case law on that was back in 1899, the Childers case. What about this case that Judge Sweeney came up—that opinion Judge Sweeney came up with seemed to go the other way from Judge Keeley? He did, Your Honor. Judge Sweeney over in Ritchie County recently wrote an opinion that seems to run counter to your proposition. It's directly counter, Your Honor. He disagreed with Judge Keeley. He said that he was aware that the case was— and this is a state law issue—and you say it's not good because it's a circuit court and it's an interlocutory order and it hadn't been appealed yet. But it is counter to Judge Keeley. Is that right? It is, Your Honor. There are different facts. He's the law and Judge Sweeney's the law. He's the judge over there in Ritchie County. That's correct, Your Honor. We've not waived our appeal rights on it. Oh, I understand. You've got a right to get that reviewed. I mean, I used to call them down there in a lot of those southern counties that whoever the judge was was the law in that county. That's what I remember going down there at Mingo, that's what they used to say. But anyway, Judge Sweeney's the judge up there in Ritchie and he ruled differently than Judge Keeley. He did, Your Honor. The day the motion to dismiss was filed, the day before the motions for summary judgment were submitted, the plaintiffs filed their suit in state court. They'd originally filed in federal court. After a year of litigating, they filed in the state court. They argued as a basis for their motion to dismiss that they could not get complete relief in front of Judge Keeley. There were issues as to diversity. They ended up joining additional plaintiffs in the state court action. Judge Keeley ruled that complete relief could be accorded in federal court, that the plaintiff, she believed, based upon her comments at an earlier hearing, was fearful that she would grant summary judgment. He wanted to get out of there. He did. And they did. And he moved to transfer it back. And so far it's worked. But we will continue to fight that and fight the dissolution. But these are state law issues. It wouldn't be better to have the Supreme Court of Appeals of West Virginia decide it than some federal court down in Richmond. We submit that the law can be interpreted by either court. Oh, well, we can. And we've had a lot of state law issues. But we try to decide them consistent with the state, what the state Supreme Court, high court, would do or has done because we shouldn't be venturing out and getting inconsistent with them. We can't. We have to apply the state law. We certainly have recent guidance from the West Virginia Supreme Court in the Arbol case. If we could appeal this case to Judge Sweeney, it might get it all straightened out. We'd all know exactly what it is, right? If they upheld Judge Sweeney and we upheld Judge Keeley, then you'd have the Fourth Circuit at odds with the Supreme Court of Appeals of West Virginia. Is that right or wrong? The potential exists for that, Your Honor, yes. Well, in terms of, I mean, Blackmore is still good law, isn't it? All of those cases are good law, Your Honor. In Arbol, the West Virginia Supreme Court most recently addressed this issue of a shareholder in a well and said a shareholder is only a shareholder, does not have an interest in a lease, is not a partner in a mining partnership. That argument was not even advanced by the plaintiffs in that case. And the law of mining partnership started out originally in West Virginia where you had the managing partner who had expended money to equip wells, these were primarily oil wells. That managing partner sought to recover from the minority partners, the other partners who had not advanced the money. And those partners said, well, this is a co-tenancy or a partnership, absent our express agreement, we cannot be held liable for this. Supreme Court said, no, where you have co-tenants under mining partnership law, they are responsible. Then the case law took a shift. Some of those minority working interest owners or mining partners then went back and said to the operating partner, you have other assets that we are entitled to and it was used by those other claiming to be mining partners to try to obtain assets. And the court said, no, those are assets obtained separately by that partner, they are not part of the mining partnership, you are not mining partners. And the more recent cases have addressed that issue, that difference where there is no co-tenancy. And Judge Keeley said, the issue before me is whether you are a mining partner. There are no other issues before me. That's the issue that I decide. It's clear under West Virginia law where you lack an ownership interest in the property. But Judge Sweeney took a different view. Well, in that case, Your Honor, one of the distinguishing features was several of those parties, most of those parties had written assignments that he looked at. And he said, based upon these written assignments, Judge Keeley's decision does not apply. Now, not all of them did. But the other parties argued that there was enough there to get past the motion for judgment on the pleading. Are you in that case? Yes, Your Honor. When would that case, when would you take an appeal? When will you go to the Supreme Court on that? Not sure, Your Honor. It's interlocutory. Well, as of now, you say it's an interlocutory order, but when is it going to be in the posture to go to Charleston? The case has been pending for over two years now. It may be... You can't get an interlocutory appeal out of it? We've not sought one. See that my time is expiring. Well, actually, you can go ahead and answer questions if we have any. I'm just asking for the timing, if you know when that case might go up. You don't know. We don't anticipate for another year, at least. You know Harry? I'm sorry? You know Harry to do that? We want to have the case fully developed before we go to Charleston with that issue. There are other issues with respect to dissolution that remain pending before the court, and we're waiting until we get a ruling on that, then we'll seek an interlocutory appeal from you. Well, we could certify this one to the Supreme Court of West Virginia, Supreme Court of Appeals, and you could take your appeal, and they wanted to consolidate both of them and decide the legal issue. They would control both of them, and then we'd have the decision made by the best court to decide it. That is a procedural option, Your Honor, yes. I'm just thinking out loud. I hadn't thought of that right now, but nobody's proposed that. We've got to be cautious in getting into these state law issues and mucking things up. We don't want to do that, but we can keep from it. Your Honor, excuse me. Help you all and give us behalf, we'd appreciate it. Mr. Arnsh, we really appreciate your work here, your fine lawyering. Thank you. We appreciate it. Thank you. Mr. Huggins? Your Honors, I will try to be very quick in my response. First of all, Judge King, I think you're exactly on point. Where am I on point? You're exactly on point in terms of inconsistent rulings between the federal court and the state court. We did suggest in our reply a certification to the West Virginia Supreme Court of Appeals if that will advance the ball. Did you ask Judge Keeley to do that or anything? No, we didn't. You could have asked it there. We could have. Let me also explain, there are a couple inaccuracies in Mr. Lawrence's disposition. First of all, we could not have done what we ended up doing in the West Virginia Circuit Court. We have West Virginia plaintiffs against West Virginia defendants and we would not have diversity. Also, in terms of the relief, we have asked the West Virginia Circuit Court to declare the partnerships dissolved at this juncture what is open. Are you in that same case? Yes, Your Honor. Our firm is. So you both are in that case? Yes, Your Honor. So you know exactly what you're talking about. I do not know what we're talking about. And in that case, you're exactly right and Mr. Lawrence is exactly right, Judge Sweeney is diametrically ruled opposite of Judge Keeley. Well, there's the fact that there were written assignments in that case. For some of the plaintiffs, some of the plaintiffs did not have written assignments. And Judge... Well, that would go to the degree of evidence, wouldn't it? Well, there are no assignments. That's the Clifton-Valentine fact pattern. There are no assignments to some of the partners who are declared to be mining partners in the mining partnerships. In response to your question, Judge Gregory, if you look at the assignments that were recorded from Mr. Dean back in the 50s, it was a 132nd working interest in the well and the lease and the partnership, a 132nd working interest in the well, the lease and the partnership. I thought so too. It wasn't just profits. Yeah. It wasn't just profits. Yes. That is correct. Where are you reading from? I'm reading from the... You don't have any documents that say that. You're saying that. No, I do have the documents. We put before Judge Keeley assignments to other partners in the mining partnership. So there are documents in the record that say that. I don't have one. And so, you know, we've gone... Extrapolating. You're extrapolating. Right. You're saying that if they got this, very likely your client got the same thing. Right. And in answer to Judge Floyd's question, the ownership interest, if I would posit no one has a direct interest in the working interest of the well because of the existence of the mining partnership. If you think about it, if Frank A. Deem had transferred 100% of the, let's say the Iams Oil lease to the Iams Oil partnership and then dribbled out assignments in the partnership to the partners, would there be a mining partnership? In my world, there would be a mining partnership because the title issue doesn't drive the partnership issue. So I would posit that Mr. Valentine is the same as those people that have those pieces of paper that did get recorded back in the late 50s or 60s. But I would also say that not even Sugar Rock has a naked working interest in the well. He is a mining partner and therefore he's subject to the same obligations of a mining partnership that he owes us certain duties, we owe him certain duties. In terms of the judicial estoppel argument, I don't know anything about the answer in that lawsuit. I don't think that's in the record. I don't know where it is. I thought I heard Mr. Lawrence say that we had a working interest and that we are an owner of a working interest, to answer to your question, but not a partner. So I think that would conclude the issue on the title issue. Let me ask you this, I really don't like to ask off-the-wall questions, but isn't this a result of the advancements in horizontal drilling, and so whoever holds the lease is the one that can really benefit, so that's what we're fighting over. And that's my final point. The issue of what the partnership owns was never before the trial court, never. The issue about what the partnership owns is now before the circuit court. It is the subject of a summary judgment motion, because if we're going to wind up these partnerships, the determination of the property rights of the partnership matters, and that's the place to do it. That's the place to dissolve the mining partnerships, because the court has jurisdiction over all the parties, all the mining partners, all the mining partnerships. It can grant plenary relief. It can declare who's a partner, who's not a partner. It can dissolve the mining partnership. You're talking about the circuit court in Ritchie County. Yes sir. Not this circuit court. Yes. This is the circuit court. I'm talking about the state trial court. I understand. In case number 11C61 in the Ritchie County Circuit Court. And that issue is before Judge Sweeney. He's already declared their mining partnerships. He's already declared everyone who is a mining partner. He has been very picky and finicky about making sure we have all the parties there. We have them all there except Mr. Valentine. We have asked him to declare a dissolution of the mining partnership, a winding up of the mining partnership, a appointment of a receiver for the purposes of winding up, and a declaration of exactly what the partnership owns. And finally, the forfeiture argument, some of these arguments I've heard before, the forfeiture argument, if you're going to forfeit it, that's another issue. It's just like dissolution. You have to have something to dissolve in the first place. So I think that you forfeited because you didn't ante up. Right. But that doesn't mean there wasn't a mining partnership and that's another issue. That's not what the court decided. The court didn't decide you've lost your interest because you didn't pay. The court just said, you're not a mining partner in a mining partnership, get out of here. And that ultimately is the case. Any other questions, your honors? I thank you very much for your time and attention. Thank you, Mr. Huggins. We appreciate it. We'll come down in Greek Council and go on to the next case.
judges: Robert B. King, Roger L. Gregory, Henry F. Floyd